# UNITED STATES CIRCUIT COURT.

## RICHMOND, (Vir.) JULY, 1819.

United States
vs.
William Chapels, Daniel Philips,
James Thomas, Daniel Livingston, } PIRACY.
Luke Jackson, Stephen Sydney, Pe-
ter Nelson, Isaac Sales, Peter John-
son, and Thomas Smith.

*The following preliminary remarks are explanatory of
the case.*

The constitution of the United States confers on con- *Construction of the "act to protect the commerce of the United States, and puuish the crime of piracy," passed 3d of March, 1819.*
gress the power "to *define* and *punish piracies* and felo-
nies committed on the high seas, and offences against the
law of nations." Art. 1. s. 8.

"The Federalist" (No. 42) says this power "belongs
with equal propriety to the general government; and is
a still greater improvement on the articles of confedera-
tion. These articles contain no provision for the case of
offences against the law of nations; and consequently *The crime of piracy is defined by the law of nations with reasonable certainty.*
leave it in the power of any indiscreet member to embroil
the confederacy with foreign nations. The provision of
the federal articles on the subject of piracies and felonies, *Robbery or forcible depredation upon the sea, animo furandi, is piracy by the law of nations and by the act of congress.*
extends no farther than to the establishment of courts for
the trials of these offences. The definition of piracies
might, perhaps, without inconveniency, be left to the law
of nations; though a legislative definition of them is
found in most municipal codes."

On the 30th April, 1790, congress passed "an act for
the punishment of certain crimes against the United
States," (among others, the crime of piracy,) the 8th sec.
of which is in these words:

"And be it enacted, That if any person or persons

RICHM'ND,
July, 1819.

United States
v.
Chapels,
and others.

shall commit upon the high seas, or in any river, haven, basin, or bay, out of the jurisdiction of any particular state, murder or robbery, or any other offence which if committed within the body of a county, would by the laws of the United States be punishable with death ; or if any captain or mariner of any ship or other vessel, shall piratically and feloniously run away with such ship or vessel, or any goods or merchandize to the value of fifty dollars, or yield up such ship or vessel voluntarily to any pirate ; or if any seaman shall lay violent hands upon his commander, thereby to hinder and prevent his fighting in defence of his ship or goods committed to his trust, or shall make a revolt in the ship ; every such offender shall be deemed, taken and adjudged to be a pirate and felon, and being thereof convicted, shall suffer death : and the trial of crimes committed on the high seas, or in any place out of the jurisdiction of any particular state, shall be in the district where the offender is apprehended, or into which he may first be brought."

At the February term of the supreme court of the United States, 1818, however, there came on the case of the United States v. Palmer et al., certified from the circuit court for the Massachusetts district. Palmer and others, citizens of the United States, had gone upon the high seas, entered and robbed the Industria Raffaeli, a Spanish ship, of various articles. In this case, the question arose, (to use the language of the chief justice,) " whether this act extends farther than to American citizens, or to persons on board American vessels, or to offences committed against citizens of the United States. The constitution having conferred on congress the power of defining and punishing piracy, there can be no doubt of the right of the legislature to enact laws punishing pirates,

although they may be foreigners, and may have commit-
ted no particular offence against the United States. The
only question is, has the legislature enacted such a law?
Do the words of the act authorize the courts of the union
to inflict its penalties on persons who are not citizens of
the United States, nor sailing under their flag, nor offend-
ing particularly against them."

The court finally came to the decision, that " the crime
of robbery, committed by a person on the high seas, on
board of any ship or vessel belonging exclusively to sub-
jects of a foreign state, on persons within a vessel be-
longing also exclusively to subjects of a foreign state, is
*not a piracy* within the true intent and meaning of the act
' for the punishment of certain crimes against the United
States,' and is not punishable in the courts of the United
States."

To supply this omission, a new provision was deemed
to be necessary ; and it is understood, that with this in-
tention, the last congress adopted the 5th section of the
" act to protect the commerce of the United States, and
punish the crime of piracy ;" passed on the 3d of March,
1819. The 5th section is in these words:

" And be it further enacted, That if any person or per-
sons whatsoever, shall, on the high seas, commit the
crime of piracy, *as defined by the law of nations,* and
such offender or offenders shall afterwards be brought
into, or found in, the United States, every such offender
or offenders shall, upon conviction thereof, before the cir-
cuit court of the United States for the district into which
he or they may be brought, or in which he or they shall
be found, be punished with death."

On Monday, the hall of the house of delegates was
filled by a large concourse of spectators. The court was

RICHM'ND, opened; the chief justice on the bench.    Mr. Stanard, the
July, 1819.
United States' attorney, appeared on the part of the United
United States States; Messrs. *A. Stevenson*, and *W. Wickham*, on the
      v.
Chapels,   part of the prisoners; Messrs. Gilmer and Bouldin, the two
and others. other counsel whom the court had added to the defence,
being prevented from attending—the first by indisposition,
the last by absence.

The prisoners (twenty-one in number) had been vari-
ously charged in three different indictments; one (under
the act of 1819) was for robbing a Spanish vessel; anoth-
er, under the same act,- for robbing a Dutch vessel; the
third, under the act of 1790, for robbing an *American*
vessel.

Samuel Poole was first put to the bar, under the first
indictment, charged with having piratically and felonious-
ly set upon, boarded, broke, and entered "a certain Span-
ish vessel or brig, belonging to certain persons whose
names are, as well as is that of the said brig, unknown,"
and robbed her of Spanish milled dollars.

The prisoner being arraigned, and the jury impannelled,
seven witnesses were sworn in

### EVIDENCE.

Samuel Stanly, a youth of 18, gave a clear and particular statement of
the transaction.   He stated, that he had belonged to the armed vessel the
Irresistable; that while she was lying in the port of Margaritta, about a
mile from shore, about 1 o'clock in the morning, she was cut out by the
crew of the privateer Creola.   Such of the crew of the Irresistable, as
wished to go ashore, were permitted to do so.   The crew of the Creola
said they were going to continue the cruise.   They *did* go on a cruise.
They went off St. Domingo, where they did but little; but off Cape An-
tonio, in the island of Cuba, they met with several vessels.   Q. What
colours did you assume?   A. No particular ones; sometimes one flag,
sometimes another; flags of different nations.   Q. Who appointed the
officers, and how?   A. They were appointed by the crew of the Creola;
(but witness could not tell particularly the manner of their appointment.)
They brought to a Spanish vessel off Cape Antonio, from which they

took $2300. During all the time of the cruise, he was on board of the Irresistable; towards the last of it, he was made master's mate, before which time he had been before the mast. Q. Did you board a number of vessels? A. We did. Q. Were they also plundered? A. some of them were. Q. What became of the money found in the Spanish vessel? A. It was shared among all hands. Q. Did you come into the waters of the United States, into the Cheaspeake Bay? A. We did. Q. What became of the vessel? A. Com. Daniels sent down and took possession of her. Witness said the crew had abandoned and dispersed. (*One of the Jurymen.*) Was it from apprehension? A. I cannot tell that. Being asked to specify the different flags under which they had sailed, he mentioned the Spanish, Buenos Ayrean, and English. The Buenos Ayrean flag was flying when she took the Spanish vessel.

On cross examination, Stanly said that he had sailed in the Irresistable about six or seven months, before she was taken by the crew of the Creola; that she had sailed from Baltimore, to make prizes under a commission from Gen. Artigas. Q. Did you not take vessels under the flag of Buenos Ayres? A. No. Q. Did you not conceive you had a right to take them? A. No: we could have taken them many a time. Q. Would you not have taken the Creola if found out of port? A. No. Q. Were you not apprised of there being a war between Buenos Ayres and Gen. Artigas? A. I was—We had it in our power to take Buenos Ayrean privateers from Baltimore, but we did not attempt it. Q. While in the Irresistable what prizes did you make? A. A ship and schooner belonging to the Portuguese. Being interrogated farther, he stated, that when the Irresistable was taken at Margaritta, he was in her asleep, and so were her crew; that fifty or sixty of the crew of the Creola had boarded her. Q. Do you know Poole? A. Yes. Q. Did you see him that night? A. No, not till the morning. They drove us below, and we had no chance of seeing till morning. He stated that the Irresistable was the strongest vessel; she mounted sixteen guns; the crew of the Creola had boarded her with two boats. Q. Had you no sentinel? A. Yes; but all were gone asleep. Q. How did you know then you were boarded with boats? A. I heard the captain say so, as well as several of the people. Q. How many were there in the crew of the Irresistable? A. About 25 or 30. Q. Was the prisoner very active? A: He was. Q. Who seemed the leader among them at that time? A. Ferguson, who was afterwards appointed captain. Q. Did you observe Black? A. He was first lieutenant at first, but they broke him. Being further questioned, in a desultory way, he stated that some of the old crew of the Irresistable were not willing to join; that when told they might go ashore, it was too late, being as much as fifty miles from land; that in the course of the cruise, they spoke about thirty or forty vessels, English, French, American, Dutch, Danes; that they boarded an American vessel bound to St. Jago; searched her trunks and took jewelry from them. Q. When you boarded vessels, did you hear an order to take Spanish or Portuguese property, but no other? A. No. Q. But in boarding the American vessel, were orders given to respect American property? A. Yes. Upon being interrogated particularly how he came to call the vessel they took a Spanish

RICHM'ND,
July, 1819.

United States
v.
Chapels,
and others.

RICHM'ND,
July, 1819.

United States
v.
Chapels,
and others.

vessel, he said she had a Spanish flag and Spanish crew. Q. Did you go on board of her? A. No; but they brought the crew on board of us to search their vessel. She was bound from Campeachy to Havana—she had four or five in her crew, besides-officers and passengers; was a very small vessel. Her captain told our captain in French he was a Spaniard. The witness being interrogated, said he did not himself understand French or Spanish. Soon after he got to Baltimore, the witness said he was put in jail, and promises were held out to him that he should not be punished if he gave evidence in the case: that he was taken in the vessel in the Patuxent by the revenue cutter. His share of the money from the prize was $29; as to the jewelry, it was set up and sold in the vessel, and the proceeds shared out, of which he received $7 more. They had also plundered a Dutch vessel, from whom they had taken some hampers of gin; as also one of Petion's schooners, from whom they took clothes, money, watches, &c. which plunder was divided among the crew. Being asked by a juryman, if they were to take Spanish and Portuguese property only, why they robbed the American, he replied that they robbed the passengers only of jewelry, but did not rob the vessel. Q. Was the jewelry Spanish or American property? A. I do not know. Q. Why did you take gin from the Dutch vessel? Was that a Spanish vessel? A. No: but because we wanted it.

Samuel Beaver—Was one of the crew of the Irresistable, when she was seized at Margaritta, in the month of March last; when taken, the boarding crew loosed her sails, and stood out to sea; hove to at daylight, and sent those ashore who chose to go; they said at first she was coming home to Baltimore, but they went a.cruising; she carried the Margaritta flag generally; but when boarding vessels, they used different flags; they boarded eight or ten, Dutch, French, American, two Spaniards; one a Spanish brig off Cape Antonio; took from her $2300. From the American vessel (the Superior) they took a cask of water, and jewelry. The money they took was shared among the crew; they sold the jewelry and divided out the money. When they arrived in the Chesapeake Bay, the crew was called together, and divided; those who were for going out again, went to one part of the vessel, the rest to another; the strongest party was for coming in, and the vessel was brought into the Patuxent. Q. Had you orders to respect particular vessels? A. No; we boarded one and all. We were prepared to take specie wherever we could find it. Q. What was the station of the prisoner in the Irresistable? A. He was captain of fore-top, and master's mate.

Cross examined—He stated, that eighteen of the crew of the Irresistable were set ashore at Margaritta; that he did not try to get ashore, because he did not wish to be drowned, the boat being leaky and full of men and clothes; that he was below and drunk when the vessel.was taken; that Captain Ferguson had told them at first he had a commission; but two days after he told them he had not; that after they found there was no commission, then they determined to board every thing. Q. When you went on board of a vessel, were you not told to take nothing but Spanish or Portuguese property? A. Yes; but if we saw any specie, it was ours. Q. Had you orders to take money wherever found? A. Yes.

He stated, that he was arrested in Baltimore, and was told he should get a dollar and a quarter a day while attending as a witness.

John Donald—Was one of the crew of the Creola; shipped at Baltimore under the Buenos Ayrean flag, for a 90 days cruise; at Margaritta the vessel was sold, and they had none to return home in, and were told the governor of Margaritta meant to press them. Captain Daniels had told some of the crew, whom he wished to enlist wtth him in the service of Venezuela, to which he had became attached, that if they did not join him, he would have them put into the fort, and fed on bread and water. Donald said, when he was asleep below, one of the crew of the Creola, who rose upon the vessel, came down to his birth, and threatened to blow out his brains if he did not join them in going against the Irresistable. They went in two boats, and seized the latter vessel; secnred the men, and hoisted sail. The officers of the Creola were confined during the mutiny. Ferguson and Black were the leaders. Ferguson was proposed on the quarter deck of the Irresistable as captain—no one objected, and he was appointed officer. They had boarded a Spanish vessel, with logwood on board, and took from her (as he understood) $3700 in specie. They boarded several vessels under the Buenos Ayrean flag; came across one of Petion's vessels, sent a boat aboard of her, took out jewelry, [there were several articles of it on the table of the court]—understood that this vessel was a pirate, and had no papers. They paid for the water taken from the American vessel, but does not know whether they paid for onions taken from the Dutchman. Q. You never thought of putting a prize-master on board of any of the vessels you saw? A. No; we would not have disturbed the vessel.—Being cross-examined, said there were orders to respect American property, and only to take Spanish and Portuguese.

John M'Fadden—Was first lieutenant on board the Creola when she was seized; gave the particulars of that transaction; on the 24th of March the mutiny took place; they seized all the small arms; threatened to blow out the brains of the officer on deck. M'Fadden was below; when he went on deck, he found fifty men armed, tried to pacify and quell them; they said they were not going to take our brig, but captain Daniels', ours not sailing fast enough; he thought at one moment he should have quelled the mutiny, but Black told them they would be strung on the beach and hung like dogs; they then sung out, " as we have begun, let us go through with it;" they took all the small arms from the Creola; they said all might stay who chose; they wished none but volunteers; only four or five remained behind; captain Daniels' other vessel tried to pursue the Irresistable next morning, then in sight (about 20 miles off) from the mast head.

Being further interrogated, said the Creola had a commission from Buenos Ayres; she was regularly commissioned; the crew shipped at Baltimore; cruise was finished at Margaritta. They did not think themselves authorized to take a vessel under the Artigas flag; on the contrary; he had known the two flags cruise together.—*Mr. Stanard*—Q. Does not the commission expressly restrict you from taking South American Spanish property? A. Yes; it is against the property of the subjects of the king of Spain.

RICHM'ND,
July, 1819.

United States
v.
Chapels,
and others.

RICHM'ND,
July, 1819.

United States
v.
Chapels,
and others.

Henry Child—Had been the first officer of the Irresistable; was below when the Creola's crew came on board; he attempted to go up with the cutlass, but was taken and confined; they told him, as soon as things were arranged, they would give him the boat, and let him go ashore. Word was passed fore and aft for every one who wished to leave the vessel to go in the boat; he and nineteen men left it; the boat was in a leaky condition—much baggage in it, but had any more been willing to go with him, the baggage would have been thrown overboard. They overhauled his and captain Daniels' trunks for the vessel's commission, but finding none, Ferguson said he could easily make papers for himself. When the Irresistable first arrived at Margaritta, the captain had taken all the papers on shore, to deposit them at the government house.

Captain Paul—Was the commander of the Creola; was asleep in the cabin when the alarm was given; was suffered to go to the upper step of the gangway; was told they did not intend to injure his vessel, but to take possession of the Irresistable; after leaving his vessel, he had fired at them; then went on board captain Daniels' other vessel, which chased them eight hours in vain. Captain Paul being asked the date of his commission, said the original had been sent to Buenos Ayres, but a copy he had of it bore date in September, 1814. It did not justify him in taking any but Spanish property.

Captain Daniels—Was the commander of the Irresistable; after the alarm was given, he was ordered by the governor to pursue her, but to no purpose; her boat returned to shore with twenty officers and men. The Irresistable had been engaged by the governor to sail to Venezuela in two days.

The evidence being gone through, the court directed the jury to be kept together, and adjourned till next morning.

On Tuesday morning the argument commenced. Mr. *Stanard* addressed the jury about an hour. On the part of the prisoner, Mr. *Wickham* spoke about half an hour, and Mr. *Stevenson* about an hour. Mr. *Stanard* closed on the part of the United States.

The counsel on the part of the United States laid down the law, and analyzed the evidence; he called upon the jury, among other things, to lend their aid in cutting down that system of brigandage which was tarnishing the reputation of our country, and demoralizing our seamen. He cited the following passage

from Bynkershoeck, to show what was piracy as defined
by the laws of nations :

"We call *pirates* and *plunderers* those who, without the authorization of any sovereign, commit depredations by sea or land," &c. &c.

The counsel on the other side contended, that the words of the act of congress were too vague and loose to authorize the jury to dip their hands in the blood of a fellow citizen; that piracy was a general term, not-clearly nor sufficiently defined in the laws of nations; that the great father of the church, to whom you would look for a definition, gave no satisfaction upon it. What says Grotius? Not one syllable. Puffendorf? Profoundly silent. What Barbeyrac? Domat? Rutherford? Montesquieu? Wolfins? Vattel? Not a solitary word by way of definition: and the reason was, that it had been left to the municipal laws of different countries to define it, and, therefore, the law of nations had not. We have only the definition of one Dutchman, Bynkershoeck; and even with that his commentator, Du Ponceau, had expressed his dissatisfaction. And yet the jury were to say upon their oaths that piracy had been defined by the law of nations. Why did not congress do their duty, in the exercise of their constitutional powers, and make a rule which might be understood by the judiciary of the country? If they had failed in doing their duty, it was their own look out; but surely no jury would take upon themselves to say, by their verdict, the law had been defined, when it was not; or upon such vague, general expressions, take the life of a fellow citizen. The counsel, by way of analogy, attempted to show that if congress had referred to other cases as defined by the law of nations, as territorial jurisdiction, the right of search,

RICHM'ND, &c., how discordant the writers, and how unsettled the
July, 1819. doctrines are upon the subject. Men, too, highly distin-
United States guished in this country, had differed upon the defini-
v. tion of piracy. The gentleman who presided in that
Chapels,
and others. court, had, in another place, (in congress,) in the case of
Jonathan Robbins, declared that not only an ·actual rob-
bery, but cruising on the high seas without a commis-
sion, and with an *intent* to rob, was piracy. Whereas
now, the United States' Attorney says actual robbery is
necessary to constitute the offence. Reference was also
had to the constitution, by which congress is to define pi-
racies and felonies committed on the high seas, and of-
fences against the law of nations, to show that the for-
mer are distinguished from the latter, as if not ranked
among the " offences against the law of nations." The
evidence was then analyzed, and commented on.—It was
the testimony of accomplices, (always suspicious,) · and
here brought from duresse of a jail, taking its colour
from- the hopes and fears of the witnesses. It was at-
tempted to be proven that they had contradicted them-
selves, and each other—that there was no satisfactory ·
evidence of this being a Spanish vessel, as charged in the
indictment—that this act of congress was passed but
ten days before they left Margaritta : they could not have
known of it ; and therefore it is, as to them, in the light
of an *ex post facto* law, &c. &c. A particular and pa-
thetic appeal was made in favour of Poole, who had
served gallantly in the navy of his country during the
late war.

Mr. *Stanard* replied to both gentlemen at considerable
length. He denied the vagueness which was ascribed to
the law of nations on the subject of piracy, and the
other points touched upon. He supported the authority

of Bynkershoeck. Vattel, b. i. ch. 19. had denounced <span>RICHM'ND,</span>
"all villains who by the quality and habitual frequency <span>July, 1819.</span>
of their crimes, violate all public security, and declare <span>United States</span>
themselves enemies of the human race. Thus pirates <span>v.</span>
are brought to the gibbet by the first into whose hands <span>Chapels, and others.</span>
they fall!" Blackstone, the Vade Mecum of all the
lawyers, says, "A pirate is an enemy of the human
race." Even if writers on the law of nations had adopt-
ed different definitions of piracy, where was the definition
of it that would not embrace the case of these men—
whose lawless depredations came up to any definition of
it which had ever been given? After developing this
idea with great force, and ridiculing the pretensions that
had been suggested, that these men had the right, under
the commission belonging to the Irresistable, to capture
Spanish property, he returned to the analysis of the tes-
timony; he showed why the testimony of accomplices
should be received; otherwise the most atrocious offences
might escape with impunity. He concluded by a strong
appeal to the jury in favour of the law—that the honour
of our country required that the law should be put in
force against brigands who not only sailed from its waters
to collect plunder, but returned to them as the scene for its
partition, and as a sanctuary where they expected to es-
cape the punishment of their crimes.

## CHARGE OF THE COURT.

The court then charged the jury in substance that the
prisoner at the bar was indicted for cruising on the high
seas without any commission, and boarding and plunder-
ing a Spanish vessel or vessels, belonging to some power
to the jurors unknown, and piratically taking out of such

RICHMND,
July, 1819.

United States
v.
Chapels,
and others.

vessel a sum of money, which the crew divided among themselves. The essential objects of inquiry were, whether the prisoner at the bar was engaged in such cruise without a commission; whether the robbery charged in the indictment was committed by him and others so cruising as aforesaid, and whether the fact amounted to piracy under the act of congress.

The fact of cruising and plundering the Spanish vessel was proved by the testimony of accomplices, and it was contended by the counsel for the prisoner that they were totally unworthy of credit.

It is undoubtedly true, that the testimony of accomplices is to be heard with suspicion; and if their testimony should be improbable, or contradicted by circumstances, or by other testimony, the jury might justifiably discredit it; but if all the circumstances of the case—circumstances which could not be mistaken or misrepresented, corroborated the testimony of the accomplice, and in fact were merely connected by that testimony, it would be going too far to say that the facts supplied by the witness were to be disregarded because he was an accomplice. But in this case, one of the witnesses, Donald, had been acquitted by the grand jury, because he was forced on board the vessel, and his testimony concurred with that of the other witnesses in all that was material.

If the robbery was committed, their next inquiry would be, whether the vessel committing it, sailed under a lawful commission.

There was not only no testimony whatever of a commission, but all the facts given in evidence were totally incompatible with the idea of sailing under any authority whatever. The crew of one vessel had mutinied, seized

another vessel, and proceeded on a cruise under officers elected by themselves.

The question whether the case came within the act of congress, was one of more difficulty. It was impossible that the act could apply to any case if not to this. The case was undoubtedly piracy according to the understanding and practice of all nations. It was a case in which all nations surrendered their subjects to the punishment which any government might inflict upon them, and one in which all admitted the right of each to take and exercise jurisdiction. Yet the standard referred to by the act of congress, as expressed in that act, must be admitted to be so vague as to allow of some doubt. The writers on the laws of nations give us no definition of the crime of piracy. Under the doubts arising from this circumstance, the court recommended it to the jury to find a special verdict, which might submit the law to the more deliberate consideration of the court.

The jury retired but for a few moments, and brought in a special verdict.

A jury was then impannelled, and the case of ten others of the crew (charged in the same indictment) was, with their consent, submitted at once to trial; the evidence gone through, and the jury returned the following special verdict:

We of the jury find that the prisoners, Bailey Durfey, William Chappels, alias William Chappel, Daniel Phillips, James Thomas, alias James West, Daniel Livingston, Luke Jackson, Stephen Sydney, Peter Nelson, Isaac Sales, and Peter Johnson, were, in the month of March, 1819, part of the crew of a private armed vessel called the Creola, (commissioned by the government of Buenos Ayres, a colony then at war with Spain,) lying in the

port of Margaritta ; that in the month of March, 1819, the said prisoners and others of the crew mutinied, confined their officers, left the vessel, and, in the said port of Margaritta, seized by violence a vessel called the Irresistable, a private armed vessel lying in that port, commissioned by the government of Artigas, who was also at war with Spain ; that the said prisoners and others having so possessed themselves of the said vessel, the Irresistable, appointed their officers, proceeded to sea on a cruise without any document or commission whatever, and while on that cruise, in the month of April, 1819, on the high seas, committed the offence charged in the indictment, by the plunder and robbery of the Spanish vessel therein mentioned. If the plunder and robbery aforesaid be piracy under the act of the congress of the United States, entitled. "an act to protect the commerce of the United States, and punish the crime of piracy," then we find the said prisoners severally and respectively guilty. If the plunder and robbery above stated, be not piracy under the said act of congress, then we find them not guilty.

JOHN C. GAMBLE, *Foreman.*

The court then adjourned.

### SUPREME COURT, U. S.

#### February Term, 1820.

This case was argued before the Supreme Court at this term by the Attorney General for the U. S. and Mr. Webster for the Prisoners.

Mr. *Justice Story* delivered the opinion of the Court. The act of congress upon which this indictment is founded provides, "that if any person or persons whatsoever shall,

upon the high seas, commit the crime of piracy, as defined by the law of nations, and such offender or offenders shall be brought into, or found in the United States, every such offender or offenders shall, upon conviction thereof, &c. be punished with death."

The first point made at the bar is, whether this enactment be a constitutional exercise of the authority delegated to congress upon the subject of piracies. The constitution declares that Congress shall have power "to define and punish piracies as felonies committed on the high seas, and offences against the law of nations." The argument which has been urged in behalf of the prisoners is, that congress is bound to define in terms the offence of piracy, and is not at liberty to leave it to be ascertained by judicial interpretation. If the argument be well founded, it seems admitted by the counsel, that it equally applies to the 8th sec. of the act of congress of 1790. ch. 9., which declares that robbery and murder committed on the high seas shall be deemed piracy ; and yet, notwithstanding a series of contested adjudications on this section, no doubt has hitherto been breathed of its conformity to the constitution.

In our judgment the construction contended for proceeds upon too narrow a view of the language of the constitution. The power given to congress is not merely "to define and punish piracies ;" if it were, the words "to define" would seem almost superfluous, since the power to punish piracies would be held to include the power of ascertaining and fixing the definition of the crime. And it has been justly observed, in a celebrated commentary, that the definition of piracies might have been left without inconvenience to the law of nations, though a legislative definition of them is to be found in most municipal codes. But the power is also given "to define and punish felonies on the high seas, and offences against the law of nations." The term "felonies," has been supposed, in

RICHM'ND,
July, 1819

United States
v.
Chapels,
and others.

the same work, not to have a very exact and determinate meaning in relation to offences at the common law committed within the body of a county. However this may be, in relation to offences on the high seas, it is necessarily somewhat indeterminate, since the term is not used in the criminal jurisprudence of the admiralty in the technical sense of the common law. Offences, too, against the law of nations, cannot with any accuracy be said to be completely ascertained and defined in any public code recognized by the common consent of nations. In respect, therefore, as well to felonies on the high seas, as to offences against the law of nations, there is a peculiar fitness in giving the power to define as well as to punish : and there is not the slightest reason to doubt that this consideration had very great weight in producing the phraseology in question.

But supposing congress were bound, in all the cases included in the clause under consideration, to define the offence, still there is nothing which restricts it to a mere logical enumeration in detail of all the facts constituting the offence. Congress may as well define by using a term of a known determinate meaning, as by an express enumeration of all the particulars included in that term. That is certain which by necessary reference is made certain. When the act of 1790 declares, that any person who shall commit the crime of robbery or murder on the high seas, shall be deemed a pirate, the crime is not less clearly ascertained than it would be by using the definitions of these terms as they are found in our treatises of the common law. In fact, by such a reference the definitions are necessarily included, as much as if they stood in the text of the act. In respect to murder, where "malice aforethought" is of the essence of the offence, even if the common law definition were quoted in express terms, we should still be driven to deny that the definition was perfect, since the meaning of "malice aforethought" would

remain to be gathered from the common law. There <span>RICHM'ND,</span> would then be no end to our difficulties, or our definitions, <span>July, 1819.</span> for each would involve some terms which might still require some new explanation. Such a construction of the constitution is, therefore, wholly inadmissible. To define piracies, in the sense of the constitution, is merely to enumerate the crimes which shall constitute piracy; and this may be done either by a reference to crimes having a technical name, and determinate extent, or by enumerating the acts in detail upon which the punishment is inflicted.

*United States* *v.* Chapels, and others.

It is next to be considered whether the crime of piracy is defined by the law of nations with reasonable certainty. What the law of nations on this subject is, may be ascertained by consulting the works of jurists, writing professedly on public law, or by the general usage and practice of nations, or by judicial decisions recognizing and enforcing the law. There is scarcely a writer on the law of nations who does not allude to piracy as a crime of a settled and determinate nature; and whatever may be the diversity of definitions in other respects, all writers concur in holding, that robbery, or forcible depredations upon the sea, *animo furandi*, is piracy. The same doctrine is held by all the great writers on maritime law in terms that admit of no reasonable doubt. The common law, too, recognizes and punishes piracy as an offence, not against its own municipal code, but as an offence against the law of nations, (which is part of the common law,) as an offence against the universal law of society, a pirate being deemed an enemy of the human race. Indeed, until the statute of 28 Hen. 8. ch. 15. piracy was punishable in England only in the admiralty, as a civil law offence; and that statute, in changing the jurisdiction, has been universally admitted not to have changed the nature of the offence. Sir Charles Hedges, in his charge at the Admiralty Sessions, in the case of Rex v. Dawson, 5 State Tr., de-

clared in emphatic terms, that " piracy is only a sea term for robbery ; piracy being a robbery committed within the jurisdiction of the admiralty." Sir Leoline Jenkins, too, on a like occasion declared, that " a robbery, when committed upon the sea, is what we call piracy," and he cited the civil law writers in proof. And it is manifest from the language of Sir Wm. Blackstone, in his comments upon piracy, that he considered the common law definition as distinguishable in no essential respect from that of the law of nations. So that, when we advert to writers on the common law of nations, we shall find that they universally treat of piracy as an offence against the law of nations, and that its true definition by that law is robbery upon the sea. And the general practice of all nations in punishing all persons, whether natives or foreigners, who have committed this offence against any person whatsoever with whom they are in amity, is a conclusive proof that the offence is supposed to depend, not upon the particular provisions of any municipal code, but upon the law of nations, both for its definition and punishment. We have, therefore, no hesitation in declaring that piracy, by the law of nations, is robbery upon the sea, and that it is sufficiently and constitutionally defined by the law.

Another point has been made in this case, which is, that the special verdict does not contain sufficient facts upon which the court can pronounce that the prisoner is guilty of piracy. We are of a different opinion. The special verdict finds that the prisoner is guilty of the plunder and robbery charged in the indictment, and finds certain additional facts, from which it is most manifest that he and his associates were, at the time of committing the offence, freebooters upon the sea, not under the acknowledged authority, or deriving protection from the flag or commission of any government. If, under such circumstances, the offence be not piracy, it is difficult to conceive any which would more completely fit the definition.